UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| MARLIN WILLIAMS, PAMELA WILLIAMS CARTHENS, JEROME THOMSON, PhD, BRENDA DEFORREST, LEVEN WEISS, J.D., MICHAEL D. BROWN, J.D., CORA WILLIAMS, and ANTHONY HILL, on behalf of themselves and all others similarly situation,<br><br>      Plaintiffs,<br><br>v.<br><br>FCA US LLC,<br><br>      Defendant. | Case No. 17-10097<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO COMPEL ARBITRATION AND DENYING DEFENDANT'S MOTION TO DISMISS AND/OR MOTION TO STRIKE CLASS ALLEGATIONS IN THE SECOND AMENDED COMPLAINT [19]**

Plaintiffs are current and former employees of Fiat Chrysler Automobiles (FCA). They challenge, for themselves and others similarly situated, an employee-evaluation policy they say has a disparate impact on African-American employees. Plaintiffs allege that as a result of this policy, they received lower evaluation scores which resulted in missed career advancements, bonuses, and other employment opportunities. Two plaintiffs additionally bring individual claims of retaliation and discrimination.

Defendant FCA seeks to compel arbitration pursuant to two arbitration policies. FCA asserts that the potential class members hired *prior to* the 1995 implementation of an arbitration policy assented to the 1995 arbitration policy when they continued to work at FCA after receiving notice of it. FCA seeks to compel those employees pursuant to either this 1995 policy or the current

policy, which was implemented in 2013. And, FCA maintains, the potential class members hired *after* the implementation of the 1995 arbitration policy assented through their employment applications. FCA seeks to compel those employees to arbitrate pursuant to the current policy (or, impliedly, pursuant to the 1995 policy).

If the Court does not compel arbitration, FCA moves to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and to strike the class allegations for failure to meet Rule 23 prerequisites.

The parties submitted extensive briefing and the Court heard oral argument on November 8, 2017. The United States Supreme Court recently issued an opinion that impacts the arbitration issue and so the Court is now ready to rule. For the reasons that follow, the Court will compel all Plaintiffs except for Leven Weiss and Pamela Williams Carthens to arbitrate and will allow Weiss and Carthens one additional opportunity to amend their complaint to cure any remaining pleading defects.

## I.

### A.

In 1995, FCA implemented an Employment Dispute Resolution Process (EDRP). (R. 19-4, PID 269.) Shortly before implementing the EDRP, FCA sent non-union employees a letter and brochure informing them of the new policy. (R. 19-4, PID 278–80.) Key to this case is that non-union employees had to arbitrate most disputes arising from their employment. (R. 19-4, PID 271–77.)

Two plaintiffs, Leven Weiss and Pamela Williams Carthens, were hired by FCA before the 1995 implementation of the EDRP. To be more precise, Weiss was hired in 1985 and Carthens in 1986. (R. 8, PID 65–67.) Their employment applications stated that if they were hired, they would

comply with all of FCA's orders, rules, and regulations. (R. 19-2, PID 250, 252.) Both signed the application and accepted employment. (*Id.*)

The remaining plaintiffs were all hired after the implementation of the first EDRP in 1995. Dr. Jerome Thompson was hired by FCA around 1997 (R. 8, PID 66), Anthony Hill was hired around 2000 (R. 8, PID 67), Brenda DeForrest was hired around 2002 (R. 19-2, PID 244), Michael Brown was hired around 2010 (R. 8, PID 67; R. 19, PID 196), and Cora Williams (C. Williams) was hired around 2012 (R. 8, PID 67; R. 19, PID 196). Each filled out employment applications stating that, if they were hired, they would comply with the EDRP. (R. 19-2, PID 241–42, 244, 246, 248.) The applications further stated that they agreed to bring any lawsuit arising out of their employment with FCA within six months or 180 days. (*Id.*). These five plaintiffs signed the employment applications and accepted employment. (*Id.*)

In 2013 FCA modified the EDRP. (*See* R. 19-2.) Plaintiff Marlin Williams ("M. Williams") was hired after the implementation of that 2013 EDRP, around January 2015. (R. 8, PID 65; R. 19, PID 196.) As part of her online application, M. Williams signed a form agreeing that she received and reviewed the EDRP and that she agreed to be bound by and comply with the EDRP. (R. 19-2, PID 240.) Unlike the other employment applications, this application contained an acknowledgement form which included an electronic link to the 2013 EDRP. (R. 19-2, PID 240.) M. Williams' application also stated that she agreed to bring any lawsuit arising out of her employment with FCA within six months or 180 days. (R. 19-2, PID 240.)

In 2015, FCA promoted M. Williams to Diversity Manager and asked her to assume many of the duties of her predecessor, Georgette Burrego Dulworth. (R. 8, PID 71.) M. Williams, unlike Ms. Dulworth, is African American. (R. 8, PID 71.) Despite taking on Dulworth's duties, FCA

3

never gave M. Williams the title of "Director," never promoted her, nor gave her any "additional perks" that came with a director-level position. (R. 8, PID 71.)

As part of her job responsibilities, M. Williams learned that FCA employees are subject to a two-step evaluation process. (R. 8, PID 73.) First, an employee's direct supervisor rates each employee's performance as "High," "Medium," or "Low." (R. 8, PID 73–74.) This is known as the Performance and Leadership Management Rating (PLM Rating). (R. 8, PID 74.) Second, management provides a numerical score, known as a Performance and Leadership Management Score (PLM Score). (*Id.*)

During this second step, termed the "calibration process," Plaintiffs say FCA managers can see the employees' headshots. (R. 8, PID 79.) The PLM Score rates employees on a one-to-nine scale. (*Id.*)[1] Scores are then adjusted according to a recommended or "forced" distribution curve. (R. 8, PID 75.) An employee who scores below a five can be placed on a Performance Improvement Program or be terminated. (R. 8, PID 74.) The higher the score, the higher the bonuses, additional pay, and chances of advancement opportunities. (R. 8, PID 75.)

M. Williams observed that, on a company-wide basis, the two-step evaluation process treated salaried, non-union, non-African-American employees more favorably overall "as to their compensation, ratings, advancement opportunities, terms, and conditions, than similarly-situated African-American employees." (R. 8, PID 75.) She also observed that African-American employees received lower scores, at five or below, at a disproportionate rate compared to non-

---

[1] During oral argument, FCA's counsel explained the process in more detail. Boxes 1, 2, 4 are denoted as "red" and represent the most deficient performance; boxes 3, 5, 7 are denoted as "yellow" and represent some positive performance and some poor performance; and boxes 6, 8, 9 are denoted as "green" and represent the best performance. The Court, though, will focus on the allegations in the amended complaint as this is a motion to dismiss.

4

African Americans. (R. 8, PID 76.) M. Williams then discovered that her own PLM Rating was downgraded after the calibration process. (R. 8, PID 76.)

As a result of this process, it is alleged, Plaintiffs and those similarly situated were disproportionately given lower PLM Scores of five and below and were given lower scores overall compared to non-African-American employees. (R. 8, PID 76–77.)

M. Williams reported the disparate impact to senior leadership. (R. 8, PID 77.) She alleges that, in retaliation, FCA accused her of underperforming, placed her under investigation, and "ostracized and essentially excommunicated her from her colleagues and upper management." (R. 8, PID 78.) M. Williams submitted her two-week notice on January 2, 2017, but was terminated the next day. (R. 8, PID 78.)

C. Williams also questioned her score to human resources and upper management. She says FCA retaliated by placing her on a Performance Improvement Plan. (R. 8, PID 79.)

This prompted C. Williams to seek relief from the Equal Opportunity Employment Commission. In particular, on June 8, 2016, C. Williams filed an EEOC charge alleging racial discrimination based upon FCA's policies and practices. (R. 19-3, PID 266.) On December 2, 2016, she was terminated. (R. 19-3, PID 267.) C. Williams then filed another EEOC complaint on December 13, 2016. (R. 19-3, PID 267.) She received her Right to Sue letters for the EEOC complaints on February 22 and February 24, 2017. (R. 8-2, PID 103–104.)

Shortly after, M. Williams filed an EEOC complaint alleging that "I and others have been subject to different terms and conditions of employment and that I have been constructively discharged due to my race, African American, and in retaliation for having participated in a protected activity." (R. 19-3, PID 268.) On March 9, 2017, M. Williams received a Right to Sue letter. (R. 8-1, PID 100.)

Plaintiffs filed a second-amended complaint on March 16, 2017 alleging class-wide relief for disparate impact prohibited by Title VII and ELCRA; violations of 42 U.S.C. § 1981; retaliation against M. Williams and C. Williams prohibited by Title VII and ELCRA; and termination of C. Williams prohibited by Title VII and ELCRA. (R. 8.)

Plaintiffs have also filed, under seal, data from FCA relating to the evaluation process's alleged adverse impact. (R. 10.)

**B.**

FCA contends that this litigation is in the wrong forum. (R. 19.) FCA believes that Plaintiffs are bound to arbitrate. According to FCA, those hired prior to 1995 assented to the EDRP by continuing to work after being notified of the policy. And, FCA says, those hired after 1995 assented to the EDRP by explicitly agreeing to arbitrate in their employment applications.

If the Court does not compel arbitration, FCA argues that the complaint should be dismissed on multiple grounds. (R. 19.) First, FCA asserts that Carthens, Thompson, DeForrest, Weiss, Brown, and Hill fail to state a claim of discrimination. (R. 19, PID 211–12.) Next, FCA asserts that potential class members failed to timely exhaust their administrative remedies and therefore their Title VII claims must be dismissed. (R. 19, PID 213–16.) FCA then urges that Plaintiffs failed to plead a plausible disparate impact claim under Title VII or ELCRA. (R. 19, PID 216–23.) FCA also asks the Court to dismiss any remaining class claims for lack of standing and a failure to adequately plead Rule 23 requirements. (R. 19, PID 223–29.) Lastly, FCA asks the Court to dismiss DeForrest, Thompson, Hill, M. Williams, C. Williams, and Brown's claims as time barred because their applications contained six-month statute of limitations, and asks the

Court to dismiss M. Williams' and C. Williams' individual claims for discrimination and retaliation as time barred on the same basis.[2]

## II.

The Court begins with FCA's motion to compel arbitration.

The Federal Arbitration Act (FAA) provides that a written provision in a contract "to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This section of the FAA "embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts." *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007) (internal citation and quotation omitted).

Even so, "[a]rbitration is a 'matter of contract' and 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Richmond Health Facilities v. Nichols*, 811 F.3d 192, 195 (6th Cir. 2016) (quoting *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). Therefore, "[b]efore compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003).

Additionally, when, as here, a federal statutory claim is asserted, the court will consider whether Congress intended that claim to be nonarbitrable. *See Stout v. J.D. Byrider*, 228 F.3d 709,

---

[2] Because FCA's argument relied upon employment applications, which were only attached to its motion, the Court advised the parties that it was converting the portion of the motion seeking dismissal on statute-of-limitations grounds to a Rule 56 motion for summary judgment. (R. 33.) The Court gave both parties an opportunity to submit additional briefing. (*Id.*)

714 (6th Cir. 2000). It is well-settled that employment-related statutory claims, such as Title VII claims, may validly be subject to an arbitration agreement enforceable under the FAA. *Willis v. Dean Witter Reynolds*, *Inc*., 948 F.2d 305 (6th Cir. 1991). The parties also do not appear to dispute that the policies cover Plaintiffs' claims. *See Stout*, 228 F.3d at 714; (R. 19-2, PID 253; R. 19-4, PID 273.) Thus, the focus of this dispute is whether the Class agreed to arbitrate its claims.

The parties first dispute whether a valid agreement to arbitrate exists. Because arbitration agreements are fundamentally contracts, the court reviews the enforceability of an arbitration agreement according to the applicable state law of contract formation. *See Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007); *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2003). Under Michigan law (which the parties agree applies), in order for a contract to be considered valid and enforceable, it must have "(1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of contract." *Thomas v*. *Lejas*, 468 N.W.2d 58, 60 (Mich. Ct. App. 1991).

**A.**

Although the EDRP was not in effect when Weiss and Carthens signed their employment applications, FCA argues that Weiss and Carthens "entered into valid and binding agreements to arbitrate" "by continuing to work" for FCA after receiving notice of the EDRP's implementation in 1995 (R. 19, PID 203.) By this, FCA refers to the fact that in May 1995, Weiss and Carthens were sent a letter informing them that Chrysler would soon implement an EDRP. (R. 19-4, PID 269–80.) Attached to that letter was a brochure that provided an overview of the process and stated about the EDRP, "IT APPLIES TO YOU. It will govern all future legal disputes between you and Chrysler that are covered under the Process." (R. 19-4, PID 279–80.) The 1995 EDRP policy provided for exclusive, final, and binding arbitration for "all eligible disputes whether based on

8

federal, state or local law including breach of contract, discrimination or retaliation claims." (R. 19-4, PID 273.) After receiving this 1995 policy, Weiss and Carthens continued to work at FCA. Thus, argues FCA, they assented to the 1995 policy via their conduct.

It is true that under Michigan law, "acceptance may be implied from the party's conduct when the offer does not require a specific form of acceptance." *Patrick v. U.S. Tangible Investment Corp.*, 595 N.W.2d 162, 167 (Mich. Ct. App. 1999). And, more specific to this case, the Sixth Circuit, applying Michigan law, has found that an arbitration agreement may be accepted though continued employment. *See Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013); *see also Dawson v. Rent-A-Center, Inc.*, 490 F. App'x 727, 730 (6th Cir. 2012). But the governing case law does not suggest that continued employment, by itself, is always sufficient to manifest assent to an arbitration policy. To the contrary, the Sixth Circuit has made clear that continued employment can manifest assent when the employee *knows* that continued employment manifests assent.

In *Seawright v. Am. Gen. Fin. Inc.*, 507 F.3d 967 (6th Cir. 2007), the Court found that a long-term employee had agreed to arbitrate by continuing her employment after receiving notice of the employer's arbitration policy. *Id.* More specifically, the employee received a letter informing her of the effective date of the arbitration program and an informational brochure that expressly advised, "Seeking, accepting, or *continuing* employment with [defendant] means that you agree to resolve employment related claims against the company . . . through this process instead of through the court system." *Id.* at 971 (emphasis added). And two years after the program went into effect, the employee received another brochure reiterating that "continuing employment" with her employer meant she agreed to resolve employment related claims through the arbitration program. *Id.* The Court held that the employee's "*knowing* continuation of employment after the effective date of the arbitration program constituted acceptance of a valid and enforceable contract

9

to arbitrate." *Id*. at 970 (emphasis added). Subsequent Sixth Circuit cases compelling arbitration likewise involved employers expressly advising their employees that continued employment would manifest assent to arbitration. *See Dawson*, 490 F. App'x at 728–29; *Tillman*, 735 F.3d at 458; *see also McGill v. Meijer*, No. 10-1055, 2011 WL 1166895, at *3 (W.D. Mich. March 28, 2011).

In *Seawright*, the Court also distinguished a case like this one: *Lee v. Red Lobster Inns of America*, 92 F. App'x 158 (6th Cir. 2004). 507 F.3d at 973. In *Lee*, as here, "the agreement at issue . . . did not contain any provision that stipulated continued employment would constitute acceptance. Thus, the agreement could not be accepted by unilateral action." 507 F.3d at 937.[3]

Additionally, FCA's reliance on *Guelff v. Mercy Health Servc.*, No. 200040, 1999 WL 3344156 (Mich. Ct. App. May 25, 1999) and *Debro v. French*, No. 15-14225, 2017 WL 927622 (E.D. Mich. Feb. 16, 2017) is misplaced. In *Debro*, the plaintiff did not contest consent. The court thus explicitly stated, "importantly, in his response to defendants' motion for summary judgment, plaintiff agrees that his continued employment with Aubree's signifies consent to an arbitration agreement." 2017 WL 927622 at *3. In *Guelff*, the court found consent where the employee had availed herself of provisions in the guidelines manual that also contained the arbitration policy. 1999 WL 3344156 at *2. Here, Weiss and Carthens were given notice of the EDRP on its own, not as part of a manual of policies that they otherwise availed themselves to.

At oral argument, FCA asserted that the line in the brochure "IT APPLIES TO YOU. It will govern all future legal disputes between you and Chrysler that are covered under the Process"

---

[3]While *Seawright* and *Lee* apply Tennessee law, their general principles relating to arbitration agreements apply here as well. Neither opinion rests on contract law that is particular to that state or that is in clear conflict with Michigan contract law.

10

sufficiently put Weiss and Carthens on notice that continued employment would constitute assent to the EDRP. (R. 19-4, PID 279.)

The Court disagrees. This language does not inform Weiss and Carthens how the ERDP applies to them and does not tell them that it applies to them if they continue to work at FCA. It is not a "provision[] that stipulated continued employment would constitute acceptance." *Seawright*, 507 F.3d at 937.

So in the absence of any signed agreement or any FCA-distributed materials expressly telling Weiss and Carthens that they would accept the terms of the EDRP by continuing their employment, the Court cannot find that there was an agreement to arbitrate. *See Stout*, 228 F.3d at 714. Accordingly, the Court denies FCA's motion to compel arbitration with respect to Weiss and Carthens.

**B.**

Brown, DeForrest, Hill, C. Williams, and Thompson were hired after the 1995 EDRP but before the 2013 EDRP. FCA argues that these five plaintiffs should be bound to arbitrate because they all signed employment applications explicitly stating that they agreed to abide by the EDRP. (R. 19, PID 200–02.)

FCA's argument rests on *Pellow*, 2006 WL 2540947, and *Waller*, 391 F. Supp. 2d 594. These cases do confirm that the FCA employment applications are valid contracts to arbitrate.[4]

---

[4] Plaintiffs' argument that the applications are unenforceable for want of mutuality of obligation is unpersuasive. (R. 25, PID 486–93.) Under Michigan law, if a contract has consideration, it necessarily has mutuality of obligation. *See J&N Koets, Inc. v. OneMarket Props. Lake Point, LLC*, 2015 WL 155890, at *3 (Mich. Ct. App. 2016); *see also Hall v. Small*, 705 N.W.2d 741, 744 (Mich. Ct. App. 2005). The Court agrees with the findings in *Pellow* that FCA's agreement to review candidates' employment applications is adequate consideration to bind them to EDRP, and thus, there is also mutuality of obligation. *See Pellow*, at *5.

Equally unpersuasive is Plaintiffs' argument that FCA is not enforcing the EDRP in a uniform fashion and therefore FCA created an expectation that employees may not be bound to

But the facts here are different. (R. 19, PID 200–21.) In *Waller* and *Pellow*, the policy had not changed between the time the plaintiffs were hired and the time they filed suit. *See Pellow*, 2006 WL 2540947, at *6; *Waller*, 391 F. Supp. 2d at 602. Here, Plaintiffs agreed to arbitrate when they filled out their employment applications. They were thus bound by the policy in place at that time—the 1995 EDRP. But the current policy is the 2013 EDRP. And the 2013 EDRP is a modification of the 1995 EDRP. (R. 31, PID 1145 ("if the Court were to conclude that we could not modify the agreement, you would go back to the prior agreement").) Apparently, from FCA's perspective, that the 1995 EDRP was in place at the time Brown, DeForrest, Hill, C. Williams, and Thompson agreed to arbitrate does not matter and that they must arbitrate pursuant to the 2013 EDRP. (R. 31, PID 1145 ("Again, our position, post-1995 plaintiffs, pre-1995 plaintiffs or pre-1995 EDRP plaintiffs are all bound by the same agreement.").)

The Court disagrees. The Sixth Circuit has found that an employer cannot change arbitration agreements in the same way as ordinary employment policies. *Dawson v. Rent-A-Center, Inc.*, 490 F. App'x 727, 732–33 (6th Cir. 2012).[5] Unlike ordinary employment policies,

---

arbitrate. (R. 25, PID 497–98.) Plaintiffs provide no supporting facts or law. *See Martin County Coal Corp. v. Universal Underwriters Ins. Servs, Inc.*, No. 08-93 2010 WL 4683808, at *4 (E.D. Ky. Nov. 12, 2010) ("The Court will therefore not consider the argument at this junction, as it is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work") (internal quotations omitted).

[5] While the Court has not found another case in this circuit facing this precise issue, the contract analysis is consistent with how courts review the validity of an arbitration agreement. Prior to waiving their right to a judicial forum, parties must have available the alternative dispute procedure they are substituting for the judicial forum. *Alonso v. Huron Valley Ambulance Inc.*, 375 F. App'x 487, 493 (6th Cir. 2010) ("[Plaintiffs] cannot be said to have knowingly and voluntarily waived their right to a judicial forum when they were not informed of the alternative procedures until a month after they began working."); *Williams v. Serra Chevrolet Automotive, LLC*, No. 12-11756, 2013 WL 183942 (E.D. Mich. Jan. 17, 2013). When the procedure is available, parties are presumed to know its contents regardless of whether or not they chose to read it. See *Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013). Thus, if parties are not bound to terms when they cannot review them, they should not be bound by terms that do not yet exist (like the 2013 EDRP).

arbitration agreements cannot be unilaterally modified and instead require that employers "follow the more restrictive procedures required for contract modification." *Id*. That more "restrictive procedure" requires mutual agreement; if there is no mutual agreement, there is no modification. *See Quality Prod. & Concepts Co. v. Nagel Precision, Inc.*, 666 N.W.2d 251, 258 (Mich. Ct. App. 2003).

So FCA needed Plaintiffs' assent prior to enforcing the 2013 EDRP against these Plaintiffs. Yet FCA provides no evidence of Plaintiffs' assent (e.g., when they assented and by which actions). And Plaintiffs have all provided sworn affidavits that they never received or even saw the 2013 EDRP. (R. 25-5, PID 578–85.) The Court therefore cannot bind the Plaintiffs to arbitrate pursuant to the 2013 EDRP.

But this is not the end of the analysis. FCA did not properly modify the EDRP as to Brown, DeForrest, Hill, C. Williams, and Thompson. So the Court will go back to the EDRP policy the Plaintiffs did agree to. *See Quality Prod.*, 469 Mich. at 262; *Crestwood Membranes, Inc. v. NSF Int'l*, No. 13-664, 2014 WL 229333 (M.D. Penn. Jan. 21, 2014) (applying Michigan contract law). As discussed above, all five of these Plaintiffs agreed to the 1995 EDRP when they signed their employment applications. They are therefore bound to arbitrate pursuant to the 1995 EDRP.

Plaintiffs make no argument to the contrary. They do not suggest that their agreement to arbitrate this employment dispute under the 1995 EDRP is vitiated by the 2013 policy or that FCA somehow relieved them of their obligations under the 1995 policy by implementing the 2013

---

Indeed, courts will not enforce arbitration policies that do not require that an employee receive notice should there be a change in the arbitration policy. See *Morrison*, 317 F.3d at 668; *Day v. Fortune Hi-Tech Marketing, Inc*., 536 F. App'x 600, 604 (6th Cir. 2013); *Eichinger v. Kelsey-Hayes Co*., No. 09-14092, 2010 WL 2720931, at *7 (E.D. Mich. July 8, 2010); *Tobel v. AXA Equitable Live Ins. Co.*, No. 298129, 2012 WL 555801, at *5–6 (Mich. Ct. App. Feb. 21, 2012).

13

policy. Instead, they contend that the 1995 EDRP is unenforceable because it contains a clause allowing FCA to unilaterally alter the policy at its "sole discretion." (R. 25, PID 494–97.) In support, they cite *Smith v. Chrysler Fin. Corp.*, 101 F.Supp.2d 534 (E.D. Mich. 2000), where the court found that the unilateral-modification provision evidenced Chrysler's intent not to be bound by the agreement thereby rendering the policy unenforceable.

But the policy at issue in this case differs from the one at issue in *Smith* in a crucial respect: the 1995 EDRP has a severability clause. (R. 19-4, PID 277.) And courts have read severability clauses as curing the intent-to-be-bound issue. *See Hicks v. EPI Printers, Inc.*, 702 N.W.2d 883, 888 (Mich. Ct. App. 2005); *Pellow*, 2006 WL 2540947, at *6. The Court therefore finds the 1995 EDRP to be an enforceable arbitration policy.

Resisting this conclusion, Plaintiffs briefly argue that FCA failed to notify them "that they waive[d] their rights to a judicial forum." (R. 25, PID 498–99.) Plaintiffs again turn to *Smith*, but this time for the proposition that the letter and brochure explaining the arbitration policy in that case did not provide sufficient notice of a judicial waiver. *Id.* at 539; *see also Lee*, 92 F. App'x at 162. But this reasoning of *Smith* and *Lee* also does not help Plaintiffs. Unlike the plaintiffs in those cases, each of Brown, DeForrest, Hill, C. Williams, and Thompson actually signed an agreement to arbitrate their employment claims. Indeed, *Smith* distinguished cases where, as here, employees actually signed an arbitration agreement.

The Court will compel Brown, DeForrest, Hill, C. Williams, and Thompson to arbitrate pursuant to the 1995 policy.

**C.**

M. Williams' was hired after the implementation of the 2013 EDRP and filled out an employment application that contained a link to that EDRP. (R. 19-2, PID 240.) Her effort to avoid arbitration is unpersuasive.

M. Williams says that she neither saw nor "received" the 2013 EDRP. (R. 25-5, PID 584). But she does not contest that the link to the policy was part of her application. That M. Williams chose not to click the link and read the policy does not mean that she did not knowingly or voluntarily waive her right to a judicial forum. *See Tillman v. Macy's, Inc.*, 735 F.3d 453, 460 (6th Cir. 2013). M. Williams will be compelled to arbitrate her claims pursuant to the 2013 policy. *See Pellow*, 2006 WL 2540947, at * 7.

**D.**

FCA also seeks to preclude the Plaintiffs from arbitrating as a class. (R. 19, PID 204-05 (citing *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011))). The 2013 EDRP explicitly states that employees are to arbitrate on an individual basis. (R. 19-2, PID 255.) And the 1995 EDRP impliedly requires arbitration on an individual basis. *See Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 599–600 (6th Cir. 2013) ("The Supreme Court has made clear that '[a]n implicit agreement to authorize class-action arbitration' should not be inferred 'solely from the fact of the parties' agreement to arbitrate.'" (citing *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010))). Plaintiffs counter that such provisions are unenforceable because they do not allow for the effective vindication of rights under Title VII and because the National Labor Relations Act (NLRA) precludes it.

The Supreme Court's recent decision in *Epic Sys. Corp. v. Lewis*, 584 U.S. ___ (2018) has resolved these arguments. First, the Court held that the NLRA does not override the FAA. Second,

the Court found that the FAA's saving clause "recognizes only defenses that apply to 'any' contract
…. Under our precedent, this means the saving clause does not save defenses that target
arbitration." *Id*. And that is precisely what Plaintiffs are targeting by arguing that a prohibition on
class arbitration is illegal under Title VII. Given the Supreme Court's decision in *Epic*, the Court
must uphold the arbitration agreements.

## III.

Since Plaintiffs Weiss and Carthens will not be compelled to arbitrate, the Court now moves to address FCA's Motion to Dismiss.

When, as here, a defendant moves to dismiss pursuant to Rule 12(b)(6), the plausibility standard articulated in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), governs. Under that standard, a court first culls legal conclusions from the complaint, leaving only factual allegations to be accepted as true. *Iqbal*, 556 U.S. at 679. The inquiry then becomes whether the remaining assertions of fact "allow[] the court to draw the reasonable inference that the defendant is liable[.]" *Id.* at 678. Although this plausibility threshold is more than a "sheer possibility" that a defendant is liable, it is not a "'probability requirement.'" *Id.* (quoting *Twombly*, 550 U.S. at 556). Whether a plaintiff has presented enough factual matter to "'nudg[e]'" his claim "'across the line from conceivable to plausible'" is "a context-specific task" requiring this Court to "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679, 683 (quoting *Twombly*, 550 U.S. at 570).

Although FCA puts forth numerous arguments for dismissal, the Court pauses at this point. The Court in the related case *Cerjanec v. FCA US, LLC* (17-10619) recently denied FCA's motion to compel and allowed plaintiffs another opportunity to amend the complaint to correct pleading deficiencies. *Cerjanec v. FCA US, LLC*, No. 17-10619, 2017 WL 6407337 (E.D. Mich. Dec. 15,

2017). The current case involves precisely the same evaluation process, as well as the same legal counsel representing the parties. As a result, before addressing the other pleading deficiencies raised in FCA's motion to dismiss, the Court will similarly allow Plaintiffs here to submit a third-amended complaint to address all alleged deficiencies.

This includes exhaustion. FCA contends that the potential class members failed to exhaust their administrative remedies.[6] In order to properly exhaust administrative remedies in a Title VII class action, one representative member of the class must bring a timely charge "which adequately identifies the collective, class-wide nature of the claimed discrimination." *Marquis v. Tecumseh Prods. Co.*, 206 F.R.D. 132, 151 (E.D. Mich. 2002); *see also Williams v. Tenn. Valley Auth.*, 552 F.2d 691, 692 (6th Cir. 1977). This charge "must alert the employer and the EEOC of the alleged class-wide discrimination, and must provide adequate notice of the scope of the proposed class, so that the parties may engage in meaningful conciliation efforts in advance of suit." *Id*. at 152. To be timely, the EEOC charge must be filed within 300 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5.

Here, M. Williams' EEOC charge reads, in part: "I and similarly situated other African-Americans, have routinely been subjected to unwarranted lower PLM/Performance Ratings. Subsequently, due to these lower performance rating scores we have been subjected to different terms and conditions of employment including but not limited to: loss of promotional opportunities, loss of merit, bonus increases, and more favorable job assignments. We have also been subjected to disciplinary action and discharge." (R. 19-3, PID 268.) Thus, M. Williams

---

[6] FCA also argues that six of the named Plaintiffs' claims are time barred because of statute of limitations provisions in their contracts. (R. 19, PID 206–11.) Since this argument does not pertain to the remaining Plaintiffs, Weiss and Carthens, the Court will not address it.

17

properly raises class claims regarding the disparate impact of the PLM process on African-American employees.

FCA does not seem to contest that. They do argue, however, that the charge is not timely. They point out that M. Williams did not file her charge until March 2, 2017, which is more than 300 days after she likely received her 2015 PLM rating. (R. 19, PID 216.) Because she began her employment in 2015, the 2015 PLM rating was the first rating she received. And because she was terminated in January 2017, the 2015 PLM rating was likely the only rating she received. The Court is aware, however, that Plaintiffs' briefing references additional EEOC charges that were filed by other Plaintiffs and potential plaintiffs after the filing of the second amended complaint. (R. 25-4.) The Court will leave it to Plaintiffs to address in their final amended complaint whether any of these EEOC charges satisfy the exhaustion requirement.

The Court therefore denies the remainder of FCA's motion to dismiss and strike without prejudice to refiling.

## IV.

For the reasons given, the Court GRANTS FCA's Motion to Compel Arbitration as to Plaintiffs M. Williams, Brown, DeForrest, Hill, C. Williams, and Thompson, and dismisses them from the case. The Court DENIES FCA's Motion to Compel Arbitration as to Plaintiffs Weiss and Carthens. The Court further DENIES FCA's Motion to Dismiss and Motion to Strike Class Allegations. Plaintiffs may submit one final amended complaint addressing the issues raised above and any pleading deficiencies identified in FCA's motion to dismiss.

SO ORDERED.

                                                                   s/Laurie J. Michelson  
                                                                   LAURIE J. MICHELSON  
Dated: May 24, 2018                         U.S. DISTRICT JUDGE

## **CERTIFICATE OF SERVICE**

       The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 24, 2018.

                                                s/Keisha Jackson
                                                Case Manager